HERRICK FEINSTEIN LLP
Stephen B. Selbst
2 Park Avenue
New York, New York 10016
(212) 592-1400
sselbst@herrick.com
*Attorneys for 275 Park Associates, LLC*

**UNITED STATES BANKRUPTCY COURT**
**EASTERN DISTRICT OF NEW YORK**
-------------------------------------------------------------x

In re

**FRESH FANATIC, INC.,**

                                     Debtor.
-------------------------------------------------------------x

**275 PARK ASSOCIATES, LLC, by and on behalf**
**of FRESH FANATIC, INC.,**

                                     Plaintiff,

    - against –

**ANDREW GOLDIN, DAVID GOLDIN AND**
**ALEXANDER GOLDIN,**
                                   Defendants.
-------------------------------------------------------------x

Chapter 11

Case No. 17 - 44263 (ESS)

Adv. Proc. No.  18-_____ (ESS)

**COMPLAINT**

       275 Park Associates, LLC ("Plaintiff"), by and through its counsel, on behalf of Fresh

Fanatic, Inc. (the "Debtor"), for its complaint against Andrew Goldin ("Andrew"), David Goldin

("David") and Alexander Goldin ("Alexander" and together with Andrew and David, the

"Insiders"), alleges as follows:

**NATURE OF THE ACTION**

       1.      The Insiders are the stockholders of the Debtor, with Andrew and David each

owning 41% of the stock of the Debtor, and Alexander, who is the father of Andrew and David,

owning 18%. In its schedules filed with this Court, the Debtor has alleged it is indebted to the Insiders as follows:

| | |
|---|---|
| Andrew Goldin | $194,840.10 |
| David Goldin | $159,995.45 |
| Alexander Goldin | $1,423,079.86 |
| | $1,777,915.41 |

2.        The Debtor's schedules reflect aggregate unsecured claims of approximately $2.055 million. In addition to the claims listed in the schedules, various other creditors, including Plaintiff, have asserted unsecured claims in the approximate amount of $900,000. If such additional claims were allowed in full, the Debtor's total unsecured liabilities would be approximately $2.95 million. Thus, the putative claims of the Insiders, if allowed, would represent approximately 60% of the total unsecured claims against the Debtors.

3.        Although the Debtor was insolvent and undercapitalized at all times, in the year prior to August 17, 2017 (the "Petition Date"), the Insiders paid themselves nearly $450,000, at a time when the Debtor urgently needed liquidity.  These preferential payments are presumptively avoidable and *prima facie* evidence of the Insiders' use of their status to benefit themselves and harm other creditors.  This action seeks, *inter alia*, to recover those transfers for the benefit of the Debtor's estate.

4.        Through this Complaint, Plaintiff objects to such claims, seeks recharacterization to reflect their true economic substance – they are equity investments, not loans. And equity requires that they be characterized as such and subordinated to the claims of bona fide non-insider unsecured creditors. The concept of owning equity in a corporation and the concept of equity in jurisprudence do not allow investors to seek the upside of a business, while at the same time preferring their own interests by siphoning off the Debtor's scarce cash in the year prior to the Petition Date.

5.      This action also seeks to remedy the actions by the Insiders to strip value from the Debtor and to disguise the economic substance of their investment by labeling it as "debt." But irrespective of how their investments were labeled, the investments were equity. Their investments were labeled as debt because the Insiders controlled the Debtor.

6.      But nothing about the purported loans from the Insiders was on market terms. On information and belief, there were no notes or other evidences of the purported indebtedness; nor was there stated interest rates or maturity dates. In short, none of the hallmarks of bona fide debt were present.

7.      It would be unjust and unfair to allow the Insiders to succeed with their scheme of looting the Debtor, then allowing their disguised equity claims to rank *pari passu* with the claims of bona fide unsecured creditors, and thus dilute whatever recoveries may otherwise be available to them. This Complaint seeks redress to reverse the effects of the Insiders' improper schemes.

## NATURE OF THE CASE

8.      Plaintiff seeks to avoid and recover from each of the Insiders or from any other person or entity for whose benefit the Insider Payments were made, all preferential transfers of property that occurred during the one-year period prior to the petition date. Subject to proof, Plaintiff also seeks to recover all fraudulent conveyances made to any of the Insiders, on or after August 17, 2015, pursuant to section 548 of the Bankruptcy Code. To the extent any insider has a claim listed on the Debt schedules as undisputed, liquidated, and not contingent, or otherwise requested payment from the Debtors or the Debtor's chapter 11 estate, this Complaint is not intended to be, nor should it be construed as, a waiver of Plaintiff right to object to such claims for any reason, including pursuant to section 502 of the Bankruptcy Code, and such rights are expressly reserved. Notwithstanding this reservation of rights, certain relief pursuant to section 502 of the Bankruptcy Code is sought by Plaintiff herein as further stated below.

## JURISDICTION AND VENUE

9.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.

10.     This adversary proceeding is brought pursuant to Rule 7001, et seq. of the Federal Rules of Bankruptcy Procedure and sections 502(d), 547, 548 and 550 of title 11 of United States Code, 11 U.S.C. § 101, et seq. (the "Bankruptcy Code").  Plaintiff consents to the entry of final orders or judgements by the Court if it is determined that the Court, absent consent of the parties, cannot enter final orders or judgements consistent with Article III of the United States Constitution.

11.     Venue in this Court is proper pursuant to 28 U.S.C. § 1409 as this adversary proceeding arises under and in connection with a case under the Bankruptcy Code which is pending in this District.

12.     This is a core proceeding as defined by 28 U.S.C. § 157(b)(2)(A), (B), (F), (H) and (0).

## FACTS

13.     The Debtor operated an organic local market grocery store and café in the Fort Greene and Clinton Hill neighborhoods in Brooklyn, New York on the ground floor of a mixed-use commercial and residential building located at 275 Park Avenue, Brooklyn, New York (the "Building"). The Debtor opened in August 2009 and ceased operations in early August 2017. The Debtor commenced its chapter 11 case on the Petition Date. The United States Trustee did not appoint a creditors committee.

14.     During its eight years in operation, the Debtor was consistently unprofitable.  Its sole year of profitability was 2013, in which it earned just $39,000. Through the end of 2016, the

Debtor accumulated net aggregate losses of nearly $2.3 million on sales of approximately $19.3 million. On information and belief, the Debtor sustained an additional loss in 2017.

15.     During its years of operation, the Debtor's debts grew steadily; its total balance sheet debt in 2009, the first year of operation, was $1.35 million, an amount that included approximately $980,000 in loans from the Insiders. On its bankruptcy schedules filed with this Court, the Debtor listed cash on hand of just $2,239.72; listed secured debt of $586,726.73 and total liabilities of $2,623,397.86, which amount included loans from the Insiders that aggregated $1.78 million [Docket 4]. In additional the liabilities scheduled by the Debtor, creditors filed additional claims aggregating approximately $1 million. The Debtor has been insolvent at all times.

16.     But despite the Debtor's meager cash resources and the substantial debt it owed to non-Insider creditors, in the year prior to the Petition Date, the Debtor nevertheless made payments to the Insiders (the "Insider Payments") as follows:  $338,700 to Alexander Goldin, $51,570.47 to David Goldin, and $56,800 to Andrew Goldin. The Debtor did not receive fair consideration in exchange for making these payments.  Details regarding the Insider Payments are set forth on Schedule 1 attached hereto. Given their status as insiders, those payments are presumptively avoidable.  It is particularly striking that the Debtor made the Insider Payments at a time when the Debtor's sales were declining rapidly and the Debtor urgently needed liquidity.

**David, Andrew and Alexander Are Insiders**

17.     The applicable look-back period under section 547(b) of the Bankruptcy Code is one year where the transferee is an insider of the debtor.  Under section 101(31) of the Bankruptcy Code, the term "insider" is defined to include, without limitation, directors, officers, or any person or corporation with the ability to control the debtor, as well as any entity that

directly or indirectly controls 20% or more of the voting securities of a debtor. A creditor is in control of a debtor when the creditor has a special relationship with the debtor which cannot [sic] be characterized as at arm's length, and whereby the debtor can be compelled to repay the creditor's debt.

18.    The enumerated categories of "insider" in the Bankruptcy Code are not exclusive. Courts have uniformly held that the Bankruptcy Code's definition is merely illustrative and that the term 'insider' must be flexibly applied on a case-by-case basis. It is not necessary that a non-statutory insider have actual control; rather the question is whether there is a close relationship the between the debtor and the creditor that suggests that any transactions were not conducted at arm's length.

19.    David and Andrew are statutory insiders under section 101(a)(31) of the Bankruptcy Code because each of them owns 41% of the stock of the Debtor. Alexander owns 18% of the stock of the Debtor, which is close to the statutory threshold of 20%, and is the father of David and Andrew. Alexander is the largest single putative creditor of the Debtor. Alexander is also the former owner of the building where the Debtor operated. When he was the owner of the building, he granted the Debtor a lease on rental terms the Debtor has characterized as below market. Moreover, in the Debtor's statement of financial affairs, David, Andrew and Alexander each listed their address as 86 Wheatley Road, Old Westbury, New York. On information and belief, that address is Alexander's residence. Given these facts, it is clear that the relationship between the Debtor and Alexander is not arm's length, and Alexander must be considered a non-statutory insider. Moreover, the Debtor identified Alexander as an insider when it listed the one-year payments to insiders in its statement of financial affairs. Thus, the Debtor is estopped from denying Alexander's insider status.

**The Avoidable Transfers**

20.    But despite the Debtor's meager cash resources and the substantial debt it owed to non-Insider creditors, in the year prior to the filing of its chapter 11 petition, the Debtor nevertheless made payments to the Insiders as follows:  $338,700 to Alexander, $51,570.47 to David and $56,800 to Andrew, all as set forth in Schedule 1 affixed here to.

21.    Because the Insider Loans existed since the Debtors' inception all such payments were made in respect of antecedent debt and were made while the Debtor was insolvent.  On information and belief, the Debtor received no consideration for such transfers.  Given their status as insiders, all such payments are avoidable as preferences or fraudulent transfers.

**Recharacterization of the Insider Loans**

22.    The purported Insider Loans should be recharacterized because an examination of their economic substance demonstrates that they were equity investments and not true loans. In considering whether purported loans should be recharacterized, courts focus on the economic reality of the surrounding circumstances.  An overarching question for courts construing parties' intentions in entering into a transaction is whether the transaction bears the earmarks of an arm's length negotiation.  Here the evidence clearly shows the Insider Loans were not arm's-length transactions.

23.    While recharacterization is determined from a review of all of the relevant circumstances, courts commonly analyze such cases based on the following factors:

- the names given to the instruments, if any, evidencing the indebtedness;

- the presence or absence of a fixed maturity date and schedule of payments;

- the presence or absence of a fixed rate of interest and interest payments;

- the source of repayments;

- the adequacy or inadequacy of capitalization;

- the identity of interest between the creditor and the stockholder;

- the security, if any for the advances;

- the corporation's ability to obtain financing from outside lending institutions;

- the extent to which the advances were subordinated to the claims of outside creditors;

- the extent to which the advances were used to acquire capital assets; and

- the presence or absence of a sinking fund to provide repayments.

24.     A review of the factors listed above shows why recharacterization should be approved here because most of those factors are present in this case:

- On information and belief, the Insider Loans were not evidenced by notes or written instruments.

- On information and belief, there were no fixed interest rates, no maturity dates and no schedule of fixed repayments for the Insider Loans.

- There was no identified source for repayment of the Insider Loans.

- The Debtor was inadequately capitalized at all times; it was insolvent and had negative stockholders' equity at all times.

- There was a complete identify of interest between the Debtor and the Insiders.

- The Insider Loans were unsecured.

- On information and belief, at the time when the initial Insider Loans were made, the Debtor was not able to obtain financing from outside lending institutions.

- On information and belief, a substantial portion of the proceeds of the initial Insider Loans were used to acquire capital assets when the Debtor was formed.

- The Debtor never established a sinking fund or dedicated any revenues or cash flow for the repayment of the Insider Loans.

25.     Given the Debtor's lack of profitability and balance sheet insolvency, the Debtor had no foreseeable prospect of generating enough cash flow to pay off the Insider Loans. For the same reasons, no outside lending institution would make a loan the Debtor if the proceeds were

going to be used to pay off the Insider Loans. Thus, the Insiders could only have expected their "loans" to be repaid if the Debtor's business was sold which is the hallmark of an equity investment. The Insiders were not acting as normal lenders, seeking a fixed and certain return, because repayment of the Insider Loans was dependent entirely upon a sale of the Debtor's business. Either the Insiders would obtain an equity return via a sale of the Debtor's business or they likely would not be paid at all.

29.    Thin or inadequate capitalization is strong evidence that the advances are capital contributions rather than loans. There can be no dispute that the Debtor was inadequately capitalized at all times during its operations. It had negative stockholders' equity for every year 2009-2016, and incurred an aggregate of approximately $2.3 million in operating losses for that period. On information and belief, it lost additional money in 2017, deepening its insolvency.

30.    It also appears that the majority of the Insider Loans were used to acquire capital assets. At December 31, 2009, the aggregate balance of the Insider Loans was $981,763, while the Debtor's total assets $660,331 and inventory was just $56,662. Thus, a substantial portion of the Insider Loans were used to acquire the Debtor's capital assets.

**The Insider Loans Should Be Equitably Subordinated**

31.    The Insider Loans should also be equitably subordinated to the claims of non-Insider creditors because the Insiders used their positions to loot the Debtor in the final year of its operation to the detriment of non-Insider creditors.

32.    After 2015, the Debtor's sales fell dramatically, from approximately $3.48 million in 2015 to $2.97 million in 2016, a drop of nearly 15%. In 2017, sales during the eight months the Debtor operated were just $1.56 million, a further fall of 47%. Even adjusting for the fact

that, the Debtor only operated for eight months in 2017, it is clear that sales were in a nosedive after 2015.

33.    But despite those falling sales, the Insiders paid themselves approximately $450,000 in the year prior the Petition Date via the Insider Payments, thus draining scarce liquidity from the Debtor – money that could and should have been used to repay the claims of non-Insider creditors. The Insiders' craven and improper payments to themselves effectively put their claims at the head of the queue, all to the detriment of the Debtor's non-Insider creditors. Such actions demonstrate the requisite degree of (a) control over the Debtor, (b) preference of the interests of the Insiders, and (c) harm to other creditors that forms the proper basis for equitable subordination.

<b><u>CLAIMS FOR RELIEF</u></b>

<b>FIRST CAUSE OF ACTION</b><br><b>(Avoidance and Recovery of Preferential Transfer)</b>

34.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth at length herein.

35.    On or within the one year preceding the Petition Date, the Debtor made, or caused to be made, one or more transfers to or for the benefit of each of the Insiders, which transfers are listed on Schedule 1 attached here to and incorporated herein by reference (the "Insider Payments").

36.    The Insider Payments were of a property interest of the Debtor as because they were paid with the Debtor's cash.

37.    For one year preceding the Petition Date, each of the Insiders was a purported creditor at the time of each Insider Payment.

38.     The Debtor made the Insider Payments for, or on account of purported antecedent debt(s) owed by the Debtor before such Insider Payments were made.

39.     The Insider Payments were made while the Debtor was insolvent.

40.     The Insider Payments enabled each Insider to receive more than such Insider would receive if: (a) the Debtors' bankruptcy cases were administered under Chapter 7 of the Bankruptcy Code; (b) the Insider Payments had not been made; and (c) such Insider received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

41.     Interest on the Insider Payments has accrued and continues to accrue from the date each of the Insider payments were made.

42.     Each Insider was the initial transferee of the Insider Payments.

43.     The Insider Payments, to the extent they are avoided pursuant to section 547(b) of the Bankruptcy Code, may be recovered by Plaintiff pursuant to section 550(a)(1) of the Bankruptcy Code.

## SECOND CAUSE OF ACTION
### (Avoidance and Recovery of One Year Fraudulent Transfers)

44.     Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set fourth at length herein.

45.     Plaintiff pleads in the alternative that to the extent one or more of the transfers as identified as on Schedule I were not on account of antecedent debt (such transfers, the "One-Year Fraudulent Transfers"), the Debtors did not receive reasonably equivalent value in exchange for such One-Year Fraudulent Transfers; and (a) the Debtor was solvent on the dates that the One-Year Fraudulent Transfers were made or became insolvent as a result of the One-Year Fraudulent Transfers; or (b) the Debtor engaged in business or a transaction, or was about to engage in business or a transition, for which any property remaining with the Debtor who

made the One Year Fraudulent Transfers were made an unreasonably small capital; or (c) the Debtor intended to incur, or believed that the Debtor would incur, debts that would be beyond the Debtor ability to pay as such debts matured.

46.    The One-Year Transfers were made to or for the benefit of each Insider within the one-year prior to the Petition Date.

47.    The One-Year Fraudulent Transfers, to the extent they are avoided pursuant to section 548 of the Bankruptcy Code, may be recovered by Plaintiff pursuant to section 550(a)(1) of the Bankruptcy Code.

## THIRD CAUSE OF ACTION
### (Disallowance of Claims)

48.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set fourth at length herein.

49.    Each of the Insiders is a recipient of the Insider Payments made to such Insider and listed on Schedule 1 annexed hereto, which are recoverable pursuant to sections 547, 548, and 550 of the Bankruptcy Code, and such Insider has not returned the Insider Payments to the Debtor.

50.    Based upon the foregoing and pursuant to section 502(d) of the Bankruptcy Code, the claims, if any, asserted, by each Insider against the Debtor (collectively the "Claims") must be disallowed since such Insider has not paid or surrendered the Insider Payments to the Debtor.

## FOURTH CLAIM FOR RELIEF
### (Recharacterization of Debt to Equity-11U.S.C. § 105 and applicable case law)

51.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though set forth at length herein.

52.    Considering the totality of the circumstances, justice and equity require that the claims of the Insiders against the Debtor should be recharacterized as equity interests. In

determining this, courts do not accept the label of debt or equity placed on a transaction but must

inquire into the actual nature of a transaction to determine how best to characterized as equity

based upon as least the following factors:

- Claims of the Insiders do not bear the earmarks of an arm's length transactions. On information and belief, the purported Insider Loans were not evidenced by notes, had no fixed interest rate and no stated maturity date.

- At all times prior to the Petition Date, the Debtor was undercapitalized.

- In effect, the Insiders negotiated both sides of the purported loans for the "lenders".

- The economic reality confronting the Debtor and the Insiders at the inception of the purported loans intent to provide the Insiders with an equity return.

- No sinking fund or reserve fund was ever established to ensure that the Debtor, would be in a position to meet its obligations under the purported loans at any time.

53.    For the reasons set forth above, Plaintiff seeks entry of an order declaring the

Insiders claims to be recharacterized as equity.

## FIFTH CLAIM FOR RELIEF
### (Equitable Subordination and Subordination-11 U.S.C. §§ 510 and 105(a))

54.    Plaintiff repeats, realleges and incorporates by reference the allegations contained

in all preceding paragraphs of this Complaint as though set forth at length herein.

55.    On their schedules filed with this court, the Debtor alleges that it is indebted to the

Insiders in the approximate aggregate amount of $1.78 million [Docket 4].

56.    The conduct of the Insiders, as alleged herein, is inequitable, and has resulted in

injury to the all non-Insider creditors of the Debtor and/or conferred an unfair advantage on the

Insiders

57.    Equitable subordination of the Insiders claims to the claims of non-Insider

creditors is consistent with the provisions of the Bankruptcy Code.

58.    Accordingly, under principles of equitable subordination, all claims asserted against the Debtor by, on behalf of, or for the benefit of the Insiders should be subordinated to the claims of the non-Insider creditors for purposes of distribution, pursuant to sections 510(c)(1) and 105(a) of the Bankruptcy Code.

**WHEREFORE**, Plaintiff prays that the Court enter a judgement against Defendant:

(a)    On Plaintiff's First Cause of Action, in favor of Plaintiff and against each of the Insiders in an amount not less than the amount of the Insider Payments made to such Insider, plus interest from the date of such Insider Payment until full payment is made to Plaintiff, together with the costs and expenses of this action, including, without limitation, attorneys' fees; and directing such Insider to turnover such sum to the Debtor pursuant to sections 547(b) and 550(a) of the Bankruptcy Code;

(b)    Plaintiff's Second Cause of Action, in favor of Plaintiff and against order of the Insiders  in an amount not less than the amount of the One-Year Fraudulent Transfers, plus interest from the date of such One-Year Fraudulent Transfers until full payment is made to the Debtor, together with the costs and expenses of this action, including, without limitation, attorneys' fees; and directing each of the Insiders to turnover such sum to the Debtor pursuant to sections 548(a)(1)(B) and 550(a) of the Bankruptcy Code;

(c)    On Plaintiff's Third Cause of Action, in favor of Plaintiff and against each Insider, disallowing the Claims pursuant to section 502(d) of the Bankruptcy Code unless and until such Insider returns the Insider payments to the Debtor; and

(d)    On Plaintiff's Fourth Cause of Action recharacterizing the Insider Loans as equity interests within the meaning of the Bankruptcy Code.

(e)    On Plaintiff's Fifth Cause of Action, equitably subordinating the claims of the Insiders to the claims of all non-Insider creditors of the Debtor.

14

(f)    Granting such other and further relief as the Court may deem just and proper.

Dated:  New York, New York
        September 20, 2018

                        HERRICK, FEINSTEIN LLP


                        /s/ Stephen B. Selbst
                        Stephen B. Selbst
                        2 Park Avenue
                        New York, New York 10016
                        Telephone: (212) 592-1400
                        Facsimile: (212) 592-1500

                        *Counsel to 275 Park Associates, LLC*

## SCHEDULE I

## INSIDER PAYMENTS

**Alexander Goldin**

| | |
|---|---|
| 9/30/2016 | $30,000.00 |
| 10/1/2016 | $800.00 |
| 10/31/2016 | $30,000.00 |
| 11/1/2016 | $800.00 |
| 11/30/2016 | $30,000.00 |
| 12/1/2016 | $800.00 |
| 12/30/2016 | $30,000.00 |
| 1/1/2017 | $60,000.00 |
| 1/31/2017 | $18,200.00 |
| 2/1/2017 | $800.00 |
| 2/28/2017 | $14,000.00 |
| 3/1/2017 | $800.00 |
| 3/31/2017 | $30,000.00 |
| 4/1/2017 | $800.00 |
| 4/30/2017 | $12,500.00 |
| 5/1/2017 | $800.00 |
| 5/31/2017 | $23,000.00 |
| 6/1/2017 | $800.00 |
| 6/30/2017 | $30,000.00 |
| 7/1/2017 | $800.00 |
| 7/31/2017 | $23,000.00 |
| 8/1/2017 | $800.00 |
| **TOTAL:** | **$338,700.00** |

**Andrew Goldin**

| | |
|---|---|
| 8/31/2016 | $2,600.00 |
| 9/30/2016 | $5,000.00 |
| 10/28/2016 | $4,000.00 |
| 12/1/2016 | $3,000.00 |
| 1/1/2017 | $3,000.00 |
| 1/31/2017 | $7,000.00 |
| 2/28/2017 | $7,000.00 |
| 3/17/2017 | $3,700.00 |
| 3/31/2017 | $5,000.00 |
| 4/11/2017 | $2,500.00 |
| 4/30/2017 | $5,000.00 |
| 5/31/2017 | $3,000.00 |
| 6/30/2017 | $3,000.00 |
| 7/31/2017 | $3,000.00 |
| **TOTAL:** | **$56,800.00** |

**David Goldin**

| | |
|---|---|
| 8/31/2016 | $4,400.00 |
| 9/8/2016 | $75.00 |
| 12/1/2016 | $3,000.00 |
| 12/5/2016 | $51.31 |
| 12/5/2016 | $44.16 |
| 12/30/2016 | $8,000.00 |
| 1/1/2017 | $3,000.00 |
| 1/31/2017 | $7,000.00 |
| 2/28/2017 | $7,000.00 |
| 3/31/2017 | $5,000.00 |
| 4/30/2017 | $5,000.00 |
| 5/31/2017 | $3,000.00 |
| 6/30/2017 | $3,000.00 |
| 7/31/2017 | $3,000.00 |
| **TOTAL:** | **$51,570.47** |